"Robert Spier maketh oath that an indictment was found against him for the alleged crime of murder, at the Spring Term, 1827, of Beaufort Superior Court, which was traversed by this affiant, and at his instance and upon his affidavit the issue of traverse was removed to Craven Superior Court for trial; that to insure a trial and the punctual attendance of all the witnesses, at the time of the said removal general notice was given by directions of the court that the said trial would be had on the Wednesday of the next term of Craven Superior *Page 330 
Court; that accordingly on that day the case was called for trial, when upon the allegation of the solicitor of the State that the State was not ready, it was at the request of the solicitor postponed until the succeeding day, Thursday; that on Thursday it was again at the request of the solicitor postponed until the next day, Friday; that on Friday, the solicitor being required by the State to try or show satisfactory cause on (492) affidavit for a continuance a jury was impaneled and sworn; that towards the night of Friday, by order of the court and by consent of the affiant and of the solicitor for the State, the jury was permitted to retire for the night, under the charge of officers sworn to keep them together; that on the succeeding morning, Saturday, the trial was resumed; that all the evidence on both sides was delivered to the jury, and at a late hour of the night the counsel on the part of the State and this affiant began their comments on the testimony, in addresses to the jury; that while the counsel for this affiant was engaged in such address the hour of 12 at night arrived; that the judge who had been holding the court stated the term had expired, and retired from the bench without having made any order for the discharge of the jury or in relation to the said trial; that the jurors so sworn and impaneled then separated, and the sheriff reconducted this affiant to prison. This affiant further saith that at the succeeding term of said court, and on the Wednesday of said term, this affiant was again brought before the court, when a motion was made by his counsel for his discharge, which motion was overruled, and thereupon, etc.
"This affiant is advised that his life has been once in jeopardy; that no other jury can pass upon the question of his guilt or innocence but the jury heretofore elected, sworn, charged, and never yet discharged; that his confinement in prison, therefore, is illegal and oppressive. And this statement of facts is made on oath in order to obtain a habeas corpus to inquire into the legality of his imprisonment."
Attached to the affidavit was a copy of the record of Craven Superior Court, from which the following are extracts:
"Saturday, 27 October, 1827.
"PRESENT, THE HONORABLE JOHN R. DONNELL.
"Jury called, etc. The prisoner's counsel closed the defense at 12:30 o'clock, when the term having expired, his Honor retired from the bench, and the prisoner was remanded to jail." *Page 331 
 "Fourth Monday after the Fourth Monday of "March, A.D. 1828.
"PRESENT, THE HONORABLE ROBERT STRANGE.
"The prisoner being brought into court for the purpose of being tried on the charge which was submitted to a jury, and on which their verdict was not returned, it was moved by his counsel that the prisoner be discharged. On argument, this motion was overruled."
After which the cause was continued by the State.
The habeas corpus was returnable on the second Monday of June last, before his Honor, the Chief Justice, who (493) requested the assistance of their honors, Judge Hall and Judge Henderson, and the question arising upon the affidavit and the record was elaborately argued by Gaston for the prisoner and by Taylor, Attorney-General, for the State.
In this case the guilt or innocence of the prisoner is as little the subject of inquiry as the merits of any case can be when it is brought before this Court on a collateral question of law. Although the prisoner, if unfortunately guilty, may escape punishment in consequence of the decision this day made in his favor, yet it should be remembered that the same decision may be a bulwark of safety to those who, more innocent, may become the subjects of persecution, and whose conviction, if not procured on one trial, might be secured on (494) a second or third, whether they were guilty or not.
It is laid down by Lord Coke that the life of a man shall not be twice put in jeopardy upon the same charge for a capital offense. 3 In., 110; 1 do., 227; Foster, 16, 22, 30. In this maxim is manifested the great concern which the law has for the security of the lives of its citizens. It is intended as a barrier against oppression and persecution; and although it must have been known to the wisdom of the law that it would be a means by which the guilty may sometimes escape from merited punishment, yet it was thought better to adopt it than to leave it to the discretion of a judge to award a second trial when the jury, in whose hands the life of the prisoner had been placed on the first trial, did not return a verdict.
From the record in this case it appears that a jury was sworn and impaneled to try the prisoner on the charge contained in the indictment, but they failed to return a verdict. This was a jury of the prisoner's own choosing, and one, too, to which *Page 332 
the State did not object. When the jury were thus charged with the prisoner, he certainly stood upon his trial — his life was jeopardized.
From this maxim there are some exceptions, but such exceptions as are under no human control — they are the offspring of necessity; as where a juror is taken suddenly sick, where a woman is taken in labor, where the prisoner becomes insane, or where the jury are discharged by consent of the prisoner or at his request.
The record states that the jury were impaneled in the case, but it assigns no reason why a verdict was not returned by the jury, and it would be worse than preposterous to say that this Court can be governed by anything else than the record. It is true, like other individuals, we are informed of the reason why the jury did not return a verdict; that the term of the (495) court expired before they had an opportunity of doing so. Let it be supposed that this fact was spread upon the record; it is certainly an event which might have been guarded against, though it was a case not without its difficulties. The trial might have been brought on sooner in the term. The jury might have been directed to withdraw and consider of the evidence after it was given in, and this the sooner if the prisoner refused to consent to withdraw a juror. I beg to be understood as laying down no rules for the government of the courts; I am not competent to do so; if I was it would not become me. But I am proving that the reason why the jury did not return their verdict was an event which might have been guarded against; that it was not founded in uncontrollable necessity, and if it was not, it forms no exception to the maxim that a citizen shall not be twice put in danger of his life upon the same charge for a capital offense.
But this is not the first time this question has arisen in this State. It was decided in S. v. Garrigues, 2 N.C. 241, for murder, in the Superior Court of Halifax, in 1795. There the presiding judge retired from the bench, but did not adjourn the court, and the jury having been impaneled in the case, separated without giving any verdict. It was held by Williams andHaywood, JJ., that the prisoner could not be put upon his trial a second time. The record there and the record in this case are alike. In both cases it appears that the jury were impaneled, but returned no verdict. It is true we learn, like other individuals, that the reason why they returned no verdict in the one case was that they could not agree; in the other, that the term expired before they considered of their verdict. But in *Page 333 
both cases the record shows, and shows nothing else, that they were impaneled, and returned no verdict before the expiration of the term. It is certainly a difficult task to distinguish, on principle, the one case from the other. I may add that that opinion drew after it the approbation of the profession, (496) and I believe I shall not treat with disrespect the memory of the dead or the pretensions of the living when I say that a greater criminal lawyer than Judge Haywood never sat upon the bench in North Carolina.
It is stated in Hale that the practice was once otherwise; that where the prisoner was put upon his trial the court might discharge the jury if it appeared that the evidence was not sufficient to convict him, and remit him to jail for further evidence. It is stated, however, in a note in the same book, that the practice is now otherwise; that a jury once charged in a capital case cannot be discharged until they have given their verdict, and Judge Haywood says, in S. v. Garrigues, supra, that "this power was exercised for the benefit of the Crown only, but is a doctrine so abhorrent to every principle of safety and security that it ought not to receive the least countenance in the courts of this country." And Haywood is sustained in this opinion by Foster, who wrote long since Judge Hale. I say, therefore, in the present case, it was not in the power of the court to discharge the jury, unless for the intervention of some cause that could not be foreseen nor controlled.
I admit that if the jury had been charged upon an indictment which was in itself defective, so that judgment could not be given upon it, although the prisoner was found guilty, it would be no bar to a second trial; because although such feelings of danger might have been awakened as are incident to human nature, and which such occasions are naturally calculated to excite, yet in reality the prisoner ran no risk; he was in no danger; he was tried as if upon no indictment. But in this case there is no objection to the indictment. If the prisoner had been found guilty he must have suffered the penalties of the law. He was placed upon his trial; his life was in the hands of the jury. His breast was occupied by a commixture of hope and fear; it throbbed alternately with both, and whether the struggle terminated in a verdict of guilt or innocence, (497) it was certainly a guarantee against any future prosecution upon the same charge, and that guarantee need not claim to be bottomed upon any extraordinary maxim marked with tenderness for the life of man. It is a plain principle of municipal jurisprudence, regulating ordinary cases of property *Page 334 
between man and man. It does not constitute the maxim that a man's life shall not be twice put in jeopardy for the same thing, to which Lord Coke, Foster, and others, fathers of the English criminal law, have given the sanction of their names.