BROCK *v.* NORTH CAROLINA.

No. 34. Argued October 23, 1952.—Decided February 2, 1953.

*Robert S. Cahoon* argued the cause and filed a brief for petitioner.

*Ralph Moody,* Assistant Attorney General of North Carolina, argued the cause for respondent. With him on the brief was *Harry McMullan,* Attorney General.

MR. JUSTICE MINTON delivered the opinion of the Court.

The petitioner and two others, Jim Cook and Elmer Matthews, employees on strike from a mill at Tarboro, North Carolina, were arrested for firing five shots from a passing auto into the house of a watchman at the mill, J. D. Wyatt. Wyatt's house was occupied at the time of the shooting by himself, his wife, his daughter and

son-in-law, and the latter couple's baby. After the shooting, the petitioner and Cook and Matthews were taken to the jail. In the presence of the sheriff, a police officer, and the petitioner, Cook stated that the petitioner had helped plan the assault and had fired the shots.

Cook and Matthews were tried first and were found guilty of assault with a deadly weapon. Before judgments were entered on their convictions, the petitioner was placed on trial. The State put three witnesses on the stand—the sheriff, the police officer, and Wyatt's son-in-law. The State then put Cook and Matthews on the stand, intending to use their testimony to corroborate that of the other three witnesses. Cook and Matthews refused to answer the questions of the State on the ground that such answers might tend to incriminate them, and their counsel informed the court that in the event of an adverse judgment on their convictions, they would appeal therefrom to the Supreme Court of North Carolina. The trial court upheld their refusal to answer. The State represented to the court that the testimony of Cook and Matthews was necessary for the State to present its case fully before the jury, and moved that the court withdraw a juror from the sworn panel and declare a mistrial. The court did so, stating: "being of the opinion that the ends of justice require that the State have available for its [sic] testimony of the witnesses Jim Cook and Elmer Matthews when the case is tried and that the State is entitled to have those witnesses to testify after their cases have been disposed of in the Supreme Court, in its discretion withdraws a juror . . . and orders a mistrial of this case and that the same be continued." The petitioner objected.

The Supreme Court of North Carolina affirmed the convictions of Cook and Matthews. 231 N. C. 617, 58 S. E. 2d 625. The State then proceeded to impanel a

jury for the second time, and this time it tried the petitioner to conclusion before this panel. He objected that to do so would place him in jeopardy a second time and thus deny him due process of law, contrary to the provisions of the Fourteenth Amendment to the Constitution of the United States. His objection was overruled, and he was placed on trial. Cook testified as a witness for the State. The petitioner was found guilty and sentenced to two years' imprisonment. From this judgment, he appealed to the Supreme Court of North Carolina, which affirmed his conviction. *State* v. *Brock,* 234 N. C. 390, 67 S. E. 2d 282. He then sought certiorari here, which we granted. 343 U. S. 914.

North Carolina has said there is no double jeopardy because the trial court has the discretion to declare a mistrial and require the defendant to be presented before another jury if it be in the interest of justice to do so. This has long been the common-law rule in North Carolina. *State* v. *Brock, supra; State* v. *Dove,* 222 N. C. 162, 22 S. E. 2d 231; *State* v. *Guice,* 201 N. C. 761, 161 S. E. 533; *State* v. *Weaver,* 13 Ired. L. (35 N. C.) 203.

The question whether such a procedure would be double jeopardy under the Fifth Amendment to the Constitution of the United States is not raised in this case, as the Fifth Amendment applies only to federal jurisdictions. *Palko* v. *Connecticut,* 302 U. S. 319; *Twining* v. *New Jersey,* 211 U. S. 78.

The question before us is whether the requirement that the defendant shall be presented for trial before a second jury for the same offense violates due process of law as required of the State under the Fourteenth Amendment. The question has been here before under different circumstances. In *Palko* v. *Connecticut, supra,* the defendant was first tried for murder in the first degree and was found

guilty of murder in the second degree. Pursuant to a statute of Connecticut, the State appealed and obtained a reversal for errors of law at the trial. The defendant was retried, convicted of murder in the first degree, and sentenced to death. An appeal to this Court raised the question whether or not the requirement that he stand trial a second time for the same offense placed him twice in jeopardy, in violation of due process.

This Court held that the State had not denied the defendant due process of law. In order to indicate the nature of due process, this Court asked two questions:

> "Is that kind of double jeopardy to which the statute has subjected him a hardship so acute and shocking that our polity will not endure it? Does it violate those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions'? . . . The answer surely must be 'no.' " 302 U. S. 319, 328.

Here the answer must be the same.

This Court has long favored the rule of discretion in the trial judge to declare a mistrial and to require another panel to try the defendant if the ends of justice will be best served. *Wade* v. *Hunter,* 336 U. S. 684; *Thompson* v. *United States,* 155 U. S. 271, 273–274. As was said in *Wade* v. *Hunter, supra,* p. 690, "a trial can be discontinued when particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice." Justice to either or both parties may indicate to the wise discretion of the trial judge that he declare a mistrial and require the defendant to stand trial before another jury. As in all cases involving what is or is not due process, so in this case, no hard and fast rule can be laid down. The pattern of due process is picked out in the facts and circumstances of

each case. The pattern here, long in use in North Carolina, does not deny the fundamental essentials of a trial, "the very essence of a scheme of ordered justice," which is due process.

The judgment is

*Affirmed.*

MR. JUSTICE BLACK took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, concurring.

Once it is agreed that the claim here made—freedom from being tried a second time on a criminal charge— must be tested by the independent scope of the Due Process Clause of the Fourteenth Amendment and not on the basis of the incorporation of the Fifth Amendment into the Fourteenth, the application of the guarantee of due process to a specific situation makes relevant the specific phrasing of a common result. I, therefore, deem it appropriate to add a word to the Court's opinion, in which I join.

The judicial history of the Fifth Amendment in prohibiting any person from being "subject for the same offence to be twice put in jeopardy of life or limb" serves as a good pragmatic confirmation of the compelling reasons why the original Bill of Rights was found to limit the actions of the Federal Government and not those of the States. The conflicting views expressed in *Ex parte Lange,* 18 Wall. 163; *Kepner* v. *United States,* 195 U. S. 100; *Trono* v. *United States,* 199 U. S. 521; *In re Bradley,* 318 U. S. 50; and *Wade* v. *Hunter,* 336 U. S. 684, indicate the subtle technical controversies to which the provision of the Fifth Amendment against double jeopardy has given rise. Implications have been found in that provision very different from the mood of fair dealing and

justice which the Fourteenth Amendment exacts from a State in the prosecution of offenders. A State falls short of its obligation when it callously subjects an individual to successive retrials on a charge on which he has been acquitted or prevents a trial from proceeding to a termination in favor of the accused merely in order to allow a prosecutor who has been incompetent or casual or even ineffective to see if he cannot do better a second time.

Unless we can say that the trial judge was not justified in the circumstances of this case in concluding that the ground for requesting a mistrial was fair and not oppressive to the accused, we would not be warranted in finding that the State of North Carolina, through its Supreme Court, denied the petitioner due process of law. The record does not seem to me to justify such a finding.

MR. CHIEF JUSTICE VINSON, dissenting.

The petitioner and two others, Cook and Matthews, were indicted for shooting into the home of J. D. Wyatt when Wyatt and four other persons were present therein. After arrest, Cook and Matthews confessed, charging Brock with firing the shots. Brock made no confession.

Cook and Matthews were tried together. Wyatt, Hathaway and Bardin, the sheriff of the county, were the witnesses presented by the State. Bardin, the sheriff, testified as to the confessions of Cook and Matthews. Cook and Matthews did not testify in their own behalf. There was a verdict of guilty of assault with a deadly weapon.

Judgment had not been entered on the verdict when Brock was placed on trial.

The same witnesses used in the foregoing trial, Wyatt, Hathaway and Bardin, testified for the State. The latter witness again testified that Cook and Matthews had

stated that Brock fired into the house. The prosecutor offered Cook and Matthews as witnesses. They declined to testify on the ground of self-incrimination, and the court sustained this claim of privilege.

At this point, the Solicitor moved to withdraw a juror and for a mistrial and the continuance of the case pending final judgment against Cook and Matthews. His motion was granted, and a mistrial and continuance of the case ordered.

Thereafter, a judgment of two years' imprisonment was entered on the verdict against Cook and Matthews. Their appeal to the Supreme Court of North Carolina was affirmed. 231 N. C. 617, 58 S. E. 2d 625 (1950).

Subsequently, Brock was brought to trial again. He interposed a plea of former jeopardy which the court denied. Proper exceptions were taken and the federal question herein presented and preserved. Then he pleaded not guilty to the indictment. The same three witnesses, Wyatt, Hathaway and Bardin, the sheriff, testified in Brock's second trial to facts substantially similar to their evidence in the first trial. The sheriff reiterated his testimony that Cook and Matthews had stated that Brock fired the rifle into the house. Thereupon, the Solicitor called Cook and Matthews to the stand, and this time they testified to the part that they took in the shooting and that Brock had fired into the Wyatt home. The jury convicted, and Brock was sentenced for a two-year imprisonment.

The Supreme Court of North Carolina affirmed the judgment, holding that Brock's plea of former jeopardy was properly denied. *State* v. *Brock,* 234 N. C. 390, 67 S. E. 2d 282 (1951).

The petitioner is here urging that he was placed in jeopardy a second time, and thereby was denied due process of law guaranteed to him by the Fourteenth Amend-

ment to the Constitution of the United States. We granted certiorari. 343 U. S. 914 (1952).

For the first time in the history of this Court, it is urged that a state could grant a mistrial in order that it might present a stronger case at some later trial and, in so doing, avoid a plea of former jeopardy in the second trial.

The Solicitor had convicted two defendants engaged in the same crime, by the testimony of Wyatt, Hathaway and Bardin, the sheriff. Cook and Matthews had refused to testify in their own behalf in that trial. Immediately the first Brock trial followed. The judgment of conviction against Cook and Matthews had not been entered. No motion for a continuance appears in the record. The State willingly entered upon the trial. It had all the witnesses and the evidence which had convicted Cook and Matthews of the same crime. It presented that evidence. Cook and Matthews refused to testify on the ground of self-incrimination, and the court sustained their position. Under the circumstances, the Solicitor either knew or should have known that Cook and Matthews would not testify. After all the State's evidence was in, and after Cook and Matthews refused to testify, the Solicitor moved for a mistrial. The basis for his motion was that the State would, at a later date, be able to present a stronger case against Brock since Cook and Matthews might, at a later date, testify differently or to additional facts than at the first trial. It must be remembered that they had not testified at any trial. The court sustained the motion that a juror be withdrawn and a mistrial ordered and the case continued pending the final judgment in the case against Matthews and Cook. The court stated it was of the opinion that "the ends of justice require that the State have available for its testimony of the witnesses Jim Cook and Elmer Matthews when the case is tried and that the State is entitled to

have those witnesses to testify after their cases have been disposed of in the Supreme Court." [1]

The sole question is whether the record in this case presents an offense to fundamental fairness and due process. Under the results reached by the Court, the state is free, if the prosecutor thinks a conviction probably cannot be won from the jury on the testimony at the trial, to stop the trial and insist that it be tried again on another day when it has stronger men on the field.

Orderly justice could not be secured if the rules allowed the defendant to ask for a mistrial at the conclusion of testimony just because the state had done well and the defense poorly. The same limitation applies to the prosecution if the scales of justice are to be kept in equal balance.[2] This Court recently has said that, in applying the concept of due process of law, judges are not at large to apply their own personal standards. *Rochin* v. *California*, 342 U. S. 165 (1952). Thus, the considered views of many other jurisdictions may be utilized in determining the basic requirements of orderly justice and hence due process. *Wolf* v. *Colorado*, 338 U. S. 25 (1949).

I grant that North Carolina contends that its present procedure does not violate fundamental fairness. It was not always so. In *State* v. *Garrigues*, 2 N. C. (1 Haywood, 2d ed.) 276, 278 (1795), the Supreme Court of North Carolina adopted the contrary rule in the following strong language:

> ". . . in the reigns of the latter sovereigns of the *Stuart* family, a different rule prevailed, that a jury in such case might be discharged for the purpose of having better evidence against him at a future day; and this power was exercised for the benefit of the

---

[1] R. 16.

[2] Cf. the classic expression of Mr. Justice Cardozo in the opinion of this Court in *Palko*, "The edifice of justice stands, its symmetry, to many, greater than before." 302 U. S. 319, 328 (1937).

crown only: *but it is a doctrine so abhorrent to every principle of safety and security, that it ought not to receive the least countenance in the courts of this country.* In the time of *James* the second, and since the Revolution, this doctrine came under examination, and the rule as laid down by *L. Coke* was revived . . . . In the present case, the jury were suffered by the court's officer to separate without giving a verdict; as they could not agree to convict, it is strong evidence of the party's innocence; and perhaps he could not be tried again with the same advantage to himself as then. Perhaps his witnesses are dead, or gone away, or their attendance not to be procured, or some accident may prevent their attendance. We will not again put his life in jeopardy, more especially as it is very improbable we shall be able to possess him of the same advantages—So he was discharged." (Emphasis supplied.)

In the case of *In re Spier,* 12 N. C. 491, 493, 494, 498, 499, 502 (1828), the court pointed out—

Hall, Judge.—"In this case, the guilt or innocence of the prisoner is as little the subject of enquiry, as the merits of any case can be, when it is brought before this Court on a collateral question of law. Although the prisoner, if unfortunately guilty, may escape punishment, in consequence of the decision this day made in his favor, yet it should be remembered, that the same decision may be a bulwark of safety to those, who, more innocent, may become the subjects of persecution, and whose conviction, if not procured on one trial, might be secured on a second or third, whether they were guilty or not."

Taylor, Chief-Justice.—"In the remarkable case of the *Kenlocks,* reported by *Foster* . . . . A majority of the Judges . . . rejected with just animadversion

the authority of those cases, which had occured in that period of misrule and persecution, preceeding the revolution. In one of these, the Court discharged a Jury in a capital case, *after evidence given on the part of the Crown, merely for want of sufficient evidence to convict, and in order to bring the prisoner to a second trial, when the Crown should be better prepared!* . . .

"These stains upon the administration of justice show to what extremes, in a state of civil discord, the passions of men urge them to trample upon the most salutary principles of law; and in what degree Judges, holding their office at the will of the sovereign, were eager to pander to his appetite for blood and forfeitures.

. . . . .

". . . As *the common law of every state already protects the accused against a second trial, not only in crimes of all descriptions,* but in questions of civil right, *it is to be inferred that the Constitutions meant much more, and that their design was to protect the accused against a trial, where the first Jury had been discharged without due cause.*" (Emphasis supplied.)

But, we are told that in a later day, the North Carolina court departed from its earlier rule. We are directed to *State* v. *Dove,* 222 N. C. 162, 22 S. E. 2d 231 (1942); *State* v. *Guice,* 201 N. C. 761, 161 S. E. 533 (1931); *State* v. *Bass,* 82 N. C. 570 (1880); *State* v. *Andrews,* 166 N. C. 349, 81 S. E. 416 (1914); and *State* v. *Ellis,* 200 N. C. 77, 156 S. E. 157 (1930).

In the *Guice* case, the State introduced its evidence and rested its case. Counsel for the defendant made a motion for judgment as of nonsuit. The court withdrew a juror and ordered a mistrial, and the authority of the court to take this course was the question presented on

appeal. The Supreme Court of North Carolina, in disposing of the matter, said:

> "In misdemeanors, and all cases of felonies not capital, the court below has the discretion to order a mistrial and discharge a jury before verdict in furtherance of justice and the court need not find facts constituting the necessity for such discharge, and ordinarily the action is not reviewable. In capital felonies the facts must be found and the necessity for such discharge is subject to review." [3]

In the *Bass* case, *supra,* the court held that the judge "had the discretion to dissolve the jury and hold the defendants for a new jury, and that the security for the proper exercise of his discretion rests not on the power of this court to review and reverse the judge, but on his responsibility under his oath of office." [4]

While the technical ramifications evolved in the many jurisdictions as part of the doctrine of double jeopardy do not fall within the scope of due process, the basic idea is part of our American concept of fundamental fairness. This is shown by the universality of the provision against double jeopardy. The Fifth Amendment to the Federal Constitution, inapplicable here, prohibits double jeopardy. The Constitutions of all but five states, Connecticut, Maryland, Massachusetts, North Carolina, and Vermont, contain clauses forbidding double jeopardy.[5] And each of those five states has the prohibition against double jeopardy as part of its common law.[6]

---

[3] 201 N. C., at 763, 161 S. E., at 534 (1931).

[4] 82 N. C., at 575 (1880).

[5] *State* v. *Brunn,* 22 Wash. 2d 120, 154 P. 2d 826, 157 A. L. R. 1049 (1945).

[6] *State* v. *Benham,* 7 Conn. 414 (1829); *Gilpin* v. *State,* 142 Md. 464, 121 A. 354 (1923); *Commonwealth* v. *McCan,* 277 Mass. 199, 178 N. E. 633, 78 A. L. R. 1208 (1931); *State* v. *Clemmons,* 207 N. C. 276, 176 S. E. 760 (1934); and *State* v. *O'Brien,* 106 Vt. 97, 170 A. 98 (1934).

No case in any other jurisdiction to support North Carolina's action in this case has been pointed out to us, and my research fails to find a single prop supporting its position. On the other hand, eight states have had occasion to rule on whether there might be a second trial after the prosecutor at a previous trial was unable to present evidence. Six have taken a firm position against allowing a second trial.[7] A seventh, Iowa, is in accord with the above view,[8] for language to the contrary in two other Iowa cases is not in point since the mistrials in those two cases were upon the motion of the defendant.[9] In Alabama, the eighth State, two cases have permitted a second trial.[10] Both of those cases, however, involved facts of such extreme nature that it would have been

---

[7] *Allen* v. *State,* 52 Fla. 1, 41 So. 593 (1906) (during first trial defendant secured continuance to secure absent witness, prosecutor then moved for and secured mistrial); *State ex rel. Meador* v. *Williams,* 117 Mo. App. 564, 92 S. W. 151 (1906) (prosecution witness did not respond to subpoena); *People* v. *Barrett,* 2 Caines (N. Y.) 304, 2 Am. Dec. 239 (1805) (State could not use secondary evidence as to document since defendant not given due notice to produce); *State* v. *Richardson,* 47 S. C. 166, 25 S. E. 220 (1896) (prosecutor by mistake told witness to go home); *Pizaño* v. *State,* 20 Tex. App. 139, 54 Am. Rep. 511 (1886) (prosecutor answered ready and started trial after being incorrectly informed by sheriff that all witnesses were present); *State* v. *Little,* 120 W. Va. 213, 197 S. E. 626 (1938) (at noon recess prosecutor told witnesses to be back at 1:30 p. m.; when they had not returned by 2 p. m. he secured mistrial). Only the leading case in each jurisdiction has been cited. There is a total of approximately fifteen more decisions in these jurisdictions in accord with the cited cases.

[8] *State* v. *Callendine,* 8 Iowa 288 (1859) (witness incompetent to testify because his name not indorsed on indictment, mistrial on motion of the court).

[9] *State* v. *Parker,* 66 Iowa 586, 24 N. W. 225 (1885), and *State* v. *Falconer,* 70 Iowa 416, 30 N. W. 655 (1886).

[10] *State* v. *Nelson,* 7 Ala. 610 (1845) (jury irregularly sworn too early and the proceedings then revealed further issues previous to the

shocking to the conscience not to permit a second trial. In one of the cases,[11] the Alabama Supreme Court even indicated the result probably would be different if the prosecutor merely had been unprepared at the first trial.

The rule to be gleaned from the cases is that a second trial will be allowed only for extreme circumstances, often contributed to by the defendant and beyond the control of the prosecutor, which prevented the testimony from being available at the first trial. Only North Carolina has clear precedent allowing a second trial when the prosecutor simply failed to have his evidence ready at the first trial.[12]

It may be considered that this being a noncapital felony that the considered action of the judiciary of a state should be followed when it is said it is in the furtherance of justice. It certainly is the easy way out, but in view of the fact that no other state in the Union has gone to this extreme of the North Carolina rule, I must ponder upon it and conclude that the hard-won victory achieved

---

time the jury should have been impaneled and sworn); *Hughes* v. *State*, 35 Ala. 351 (1860) (before trial defendant agreed to a mistrial if a certain witness were too intoxicated to testify; defendant then objected to a mistrial when the agreed condition occurred).

[11] "If the question really was, that the jury had been discharged because the prosecuting officer was not prepared to proceed with the trial, we should entertain very serious doubts of the power of a Court to discharge a jury for that cause only; but it is a very different matter when, from the intervention of some irregularity in the proceedings, either a jury has been improperly impanneled, or an improper juror sworn." *State* v. *Nelson, supra,* at 614.

[12] *State* v. *Dove,* 222 N. C. 162, 22 S. E. 2d 231 (1942) (court ordered mistrial since evidence desired by State "was not presently available"); *State* v. *Guice,* 201 N. C. 761, 161 S. E. 533 (1931) (defendant moved for nonsuit after State had offered all its testimony; court instead of ruling on the motion for nonsuit declared a mistrial).

in the field of "double jeopardy" ought not be lost even in a small part by the affirmance of this case.

The Attorney General of North Carolina relies upon *Palko* v. *Connecticut,* 302 U. S. 319 (1937), in support of his position that the second trial of this defendant did not violate due process. In *Palko,* there was an appeal by the State, as allowed by statute. The Supreme Court of Connecticut found three errors prejudicial to the State committed by the trial court, and reversed the judgment and ordered a new trial.[13] The second trial then followed. In the case before the Court, no error of law tainted the first trial.

It is apparent that in the *Palko* case, the Legislature of Connecticut had provided for a review of the trial by appeal. We often have said that the considered action by a state legislature or the Congress of the United States places the issue of constitutionality in a different posture in respect of due process of law. We agree that *Palko* decided that this Court could consider a particular case of double jeopardy of a defendant as not being within the protective limits of due process of the Fourteenth Amendment to the Constitution.

Certainly, *Palko* did not decide the issue in this case. In that case, under a state statute, the State was asking for a second trial to obtain a trial free from error by the court prejudicial to the State. Here, the State asks for its second trial in order to suit the convenience of the Solicitor in an endeavor to strengthen the State's case, when the defendant had done nothing either to bring about trial errors or to inveigle or entrap the Solicitor to proceed to the first trial.

While this case is not controlled by *Palko,* I am comforted by language found in it which, in my view, envisions this case as one which might well be within the

---

[13] *State* v. *Palko,* 121 Conn. 669, 186 A. 657 (1936).

protective embrace of the Due Process Clause of the Fourteenth Amendment. Speaking for the Court, Mr. Justice Cardozo said:

> "What the answer would have to be if the state were permitted after a trial free from error to try the accused over again or to bring another case against him, we have no occasion to consider. We deal with the statute before us and no other. The state is not attempting to wear the accused out by a multitude of cases with accumulated trials. It asks no more than this, that the case against him shall go on until there shall be a trial free from the corrosion of substantial legal error." [14]

I also receive comfort from the language contained in MR. JUSTICE FRANKFURTER's concurring opinion in this case. He says that a state falls short of its obligation "when it callously subjects an individual to successive retrials on a charge on which he has been acquitted or prevents a trial from proceeding to a termination in favor of the accused merely in order to allow a prosecutor who has been incompetent or casual or even ineffective to see if he cannot do better a second time." In my view, this case is snugly embraced in his very clear statement of the law as I have always understood it until today.

*Wade* v. *Hunter,* 336 U. S. 684 (1949), is cited in support of the discretion of a trial judge "to declare a mistrial and to require another panel to try the defendant if the ends of justice will be best served." *Thompson* v. *United States,* 155 U. S. 271, 273–274 (1894), is likewise referred to in the majority opinion. I have no quarrel with either of these cases. In the *Wade* case, with which I agree, the court-martial trial was held in the midst of the campaign to overthrow the forces of Germany. There was a continuance in the trial to get certain wit-

---

[14] 302 U. S., at 328 (1937).

nesses. Before that date was reached, there were further advances toward the enemy. The Army needed the officers participating in the trial for tactical purposes, and the court-martial was dissolved. In the *Thompson* case, after the jury was sworn and a witness testified, a member of the jury was found to be disqualified because he was a member of the Grand Jury which filed the indictment. The jury was discharged, and a plea of jeopardy was interposed at the second trial. Nothing was called to the attention of the prosecutor or the court that such a condition obtained or might have obtained. The plea of former jeopardy was overruled with cases cited. The Court said:

> "Those cases clearly establish the law of this court, that courts of justice are invested with the authority to discharge a jury from giving any verdict, whenever in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; and that the defendant is not thereby twice put in jeopardy within the meaning of the Fifth Amendment to the Constitution of the United States."[15]

I submit there was no manifest necessity to discharge this jury after the State had proceeded to trial and offered all its evidence, and I submit that the ordering of a mistrial here for the convenience of the State does not promote the ends of public justice.

MR. JUSTICE DOUGLAS, dissenting.

In 1795, when the reasons for the guarantee against double jeopardy were still fresh in men's minds, a North Carolina court stated the basis for not allowing the prose-

---

[15] *Thompson* v. *United States*, 155 U. S. 271, 274 (1894).

cution to have a jury discharged so that it could obtain better evidence against the accused.

"The rule as laid down in 3 Co. Inst., 110, and 1 Inst., 227, is general and without exception that a jury in a capital case cannot be discharged without giving a verdict. Afterwards, however, in the reigns of the latter sovereigns of the Stuart family, a different rule prevailed, that a jury in such case might be discharged for the purpose of having better evidence against him at a future day; and this power was exercised for the benefit of the crown only; but it is a doctrine so abhorrent to every principle of safety and security that it ought not to receive the least countenance in the courts of this country. In the time of James II., and since the Revolution, this doctrine came under examination,[*] and the rule as laid down by my

---

*The strict rule, laid down by Coke, was departed from during the reign of the Stuarts (1603–1714), notably in the case of the treason trials of *Whitebread* and *Fenwick*, 7 How. St. Tr. 120 and 315. There the jury was discharged at the close of the Crown's evidence, because of the failure to satisfy the two-witness rule. The defendants were later retried after the prosecution had remedied the defect. See also 2 Hale's P. C. 294. This practice was condemned in 1746 as an example of the great abuse to which the power to discharge the jury is subject. See *Kinloch's Case*, 2 Foster's Reports 16, 22.

In 1698 in the time of Lord Holt, the judges formulated rules regarding the matter: "(1.) That in capital Cases a Juror cannot be withdrawn, tho' all Parties consent to it. (2.) That in criminal Cases, not capital, a Juror may be withdrawn, if both Parties consent, but not otherwise. (3.) And that in all civil Causes, a Juror cannot be withdrawn, but by Consent of all Parties." See Carthew's Reports 465.

Those rules were in time construed to be rules of practice or guides for the exercise of discretion, not rules of law, the breach of which entitled a defendant to plead former jeopardy. See *Queen* v. *Charlesworth*, 1 B. & S. 460; *Winsor* v. *Queen*, 118 Eng. C. L. R. 141; *Queen* v. *Lewis*, 2 Cr. App. R. 180. There is a review of this history in the dissenting opinion of Crampton, J., in *Conway* v. *Regina*, 7 Irish L. Rep. 149, 165 *et seq*.

Lord Coke was revived with this addition, that a jury should not be discharged in a capital case unless for the benefit of the prisoner; as if the prisoner be a woman and be taken in labor; or if the prisoner after the jury are charged with him be found to be insane, and the like; or if at the prisoner's request a jury be withdrawn to let him in to take the benefit of an exception, which otherwise he would have lost . . . . In the present case the jury were suffered by the court's officer to separate without giving a verdict. As they could not agree to convict, it is strong evidence of the party's innocence; and perhaps he could not be tried again with the same advantage to himself as then. Perhaps his witnesses are dead, or gone away, or their attendance not to be procured, or some accident may prevent their attendance. We will not again put his life in jeopardy, more especially as it is very improbable we shall be able to possess him of the same advantages." *State* v. *Garrigues*, 2 N. C. 241, 242.

That point of view should shape our conception of double jeopardy and due process of law. Once the prosecution can call a halt in the middle of a trial in order to await a more favorable time, or to find new evidence, or to make up the deficiencies in the testimony of its witnesses, the promise of protection against double jeopardy loses the great force it was thought to have when the Constitution was written. At that time the practices of the Stuarts were freshly in mind. And it was resolved that they should not reach these shores.